IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02438-MEH

LEX PHILLIPS, and
LEX PHILLIPS & ASSOCIATES, INC.,

      Plaintiffs,

v.

CARPET DIRECT CORPORATION,
GAYLE CROUCH,
GREG JENSEN,
CHARLES OWENS, and
TODD KINSEY,

      Defendants.

---

## ORDER ON MOTION TO DISMISS

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [filed November 11, 2016; ECF No. 19].  The motion is fully briefed, and the Court finds that oral argument (not requested by the parties) would not materially assist the Court in its adjudication of the motion.  Based on the record before it, the Court grants in part and denies in part the Defendants' motion.[1]

## BACKGROUND

      Plaintiffs initiated this action on September 29, 2016 asserting this Court's federal question jurisdiction based on alleged federal claims and its pendent jurisdiction over the alleged state law

---

[1]The parties consented to this Court's jurisdiction to hear all matters on November 17, 2016.  ECF No. 22.

claims.  ECF No. 1.

## I.    Statement of Facts

The following are pertinent factual allegations (as opposed to legal conclusions, bare assertions or merely conclusory allegations) made by Plaintiffs in the Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must limit its review to the four corners of the Complaint, but may also consider documents attached to the pleading as exhibits, *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001), as well as any unattached documents which are referred to in the Complaint and central to the plaintiff's claim, so long as the authenticity of such documents is undisputed.  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002).

Defendant Carpet Direct Corporation ("CDC") sells floor coverings including carpet, hardwood, laminate, tile, and stone to end-user consumers.  According to CDC's business model, "Brokers" are individuals who, for proper consideration paid to CDC, are permitted to form their own businesses under the CDC business model and name and are paid commissions by CDC for sales they complete.  These  Brokers are required to meet certain sales quotas, and failure to meet such quotas may result in reduction of commissions.  CDC profits from its employment of Brokers across the country.

Plaintiff Lex Phillips ("Phillips") was employed by CDC in the summer 1996 as a "Broker."  At or about that time, Phillips attended a broker meeting with Earl Crouch, owner and founder of CDC.  Crouch convinced Phillips to form a business with CDC by telling him and other attendees that they would eventually own and have complete control of their own businesses.  Based on Crouch's statements, Phillips decided to invest his time and resources to become a Broker for CDC,

and incorporated the Plaintiff business entity, Lex Phillips & Associates, Inc. ("LP&A") solely for such purpose.

According to the contract with CDC, the Plaintiffs had exclusive rights to operate as a Broker in a defined territory in Northern Colorado and Southern Wyoming: the "counties of Larimer, Boulder[,] and Weld" and "[t]he municipalities of Ft. Collins, Loveland, Windsor, Greeley, Wellington, and Cheyenne, WY." Phillips understood from Crouch and other CDC personnel that his rights to operate in this territory would be exclusive and, from 1996 to 2015, it was exclusive.

As a Broker, Phillips worked hard to establish his business by handling all sales, marketing, and expenses for CDC within his territory, and by selling products during the day and removing and disposing of carpet for new customers without compensation at night. He rented a truck large enough to hold the carpet and pad he picked up and delivered, and at the outset even stored carpet and pad in his own garage because he could not afford to lease a warehouse and/or forklift necessary for his jobs. Later, Phillips established a warehouse for CDC in Windsor, Colorado for which CDC paid 1% of Plaintiffs' sales volume; however, if warehouse expenses exceeded 1% for any given period, the difference was deducted from Phillips' commissions. But, if Plaintiffs' volume exceeded warehouse expenses in a given period, it was not credited to later shortfalls.

Defendant Todd Kinsey is a former employee of LP&A and, also, a family friend of Defendant Charles Owens, CDC Director of Sales and Marketing. In or about 2015, Kinsey complained to Owens that he was not making enough money working at LP&A. Owens, although aware that Plaintiffs had exclusive rights to operate there, established a CDC brokerage in Loveland, Colorado and assigned Kinsey as the Broker. In an effort to conceal this apparent "breach" of Plaintiffs' contract, Owens directed Kinsey to transfer sales information onto generic forms listing

no city or zip code to disguise where sales were made, so Kinsey could be paid brokerage commissions for product delivered to the LP&A's Windsor warehouse.  When Phillips complained, Owens promised to reimburse Plaintiffs for 100% of the commissions improperly paid to Kinsey, but he never did so.

Phillips lodged complaints to Vearl Jones, CDC Assistant Director of Sales and Marketing, on August 19, 2015, directly to Owens in January 2016, and to Defendant Greg Jenson, CDC Director of Operations, in May 2016, but they did nothing to remedy the problems.

In addition, CDC represented to its Brokers, including Phillips, and to its customers that the carpet pad they obtained from CDC was made of "virgin foam," an industry term denoting the high quality of the pad.  However, while charging a higher price for such "virgin foam," CDC knew the carpet pads were made from recycled carpet pads.

CDC imposes several requirements on Brokers including: (1) comply with CDC's rules, policies, and procedures or face termination; (2) attend training and meetings upon notice of CDC; (3) provide services as dictated by CDC's business model; (4) refrain from assigning Broker duties; (5) hire employees only with CDC approval; (6) refrain from engaging in any competing employment; (7) work full time and the days and hours specified by CDC, including Saturdays, up to 62 hours per week; (8) work on the CDC's leased premises using equipment owned by CDC; (9) perform their duties on days of the week directed by CDC; (10) submit bi-weekly written reports concerning activities of the brokerage and the Broker's supervision of sales agents; (11) incur business and travel expenses, some of which were reimbursed by CDC; (12) recognize that all samples, materials, training materials, brochures, warehouse equipment, and buildings were owned and/or controlled by CDC; (13) use warehouses and equipment provided by CDC, but not invest in

any facilities or materials; and (14) acknowledge that their employment could be terminated at any time and they could quit employment at any time.

Phillips, as a Broker, was paid by CDC as an independent contractor and was not provided any employment benefits including vacation pay, paid overtime, unemployment when terminated, workers compensation, social security benefits, or training required by the Department of Transportation, Occupational Safety & Health Administration and other federal and state agencies.

## II.    Procedural History

Based on these allegations, Plaintiffs assert violations of the Fair Labor Standards Act ("FLSA"), unjust enrichment, breach of contract, and tortious interference against the Defendants. Complaint, ECF No. 1-1.  Plaintiffs seek injunctive relief under the FLSA and recovery for "compensatory damages," "liquidated damages for violations of the FLSA," and "punitive damages to be determined at trial."  *Id.* at 9.

In response to the Complaint, Defendants filed the present motion to dismiss on November 11, 2016, arguing that Plaintiffs' allegations fail to state plausible claims for relief pursuant to Fed. R. Civ. P. 12(b)(6).  Specifically, Defendants contend that LP&A is not a proper plaintiff in this case; the FLSA claim is barred by the applicable statute of limitations; Plaintiffs fail to state FLSA claims against the individuals Defendants; Plaintiffs' unjust enrichment claim is precluded by the existence of a contract and is barred by the statute of limitations; Plaintiffs fail to state an unjust enrichment claim against the individual Defendants; Plaintiffs fail to state breach of contract and tortious interference claims because the subject contract term does not exist; and Plaintiffs' allegations against the individual Defendants are not sufficient to state tortious interference.

Plaintiffs counter that although LP&A was not a party to any contracts, it was the recipient

of most at-issue payments in this case; Defendants' case law concerning the FLSA statute of limitations is inapplicable; Plaintiffs' FLSA claims are properly stated against the individual Defendants; factual disputes concerning the existence of a contract preclude dismissal of Plaintiffs' unjust enrichment claim; Plaintiffs' allegations regarding "exclusivity rights" are sufficient to demonstrate a contract term for purposes of the breach of contract and tortious interference claims; and the allegations are sufficient to demonstrate "motivation" for the tortious interference claims.

Defendants reply that Plaintiffs are incorrect in interpreting case law concerning FLSA statute of limitations; their allegations of individual liability do not survive the standard set by the Supreme Court in *Twombly*; neither the statute nor case law support LP&A as an FLSA plaintiff; Plaintiffs' affirmation of his contracts with CDC foreclose recovery under a theory of unjust enrichment against the entity, and Plaintiffs have abandoned the claim against the individual Defendants; an ongoing injury does not toll limitations for unjust enrichment; and Plaintiffs have failed to adequately plead an "exclusivity" contract term.

## **LEGAL STANDARDS**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678-80. Second, the Court must consider the factual allegations "to determine

if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Okla.*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

The adequacy of pleadings is governed by Federal Civil Procedure Rule 8(a)(2), which requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations omitted). Determining whether the allegations in a complaint are "plausible" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. If the "well pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to "show[ ] that the pleader is entitled to relief" as required by Rule 8(a)(2). *Id.*

## ANALYSIS

Defendants' motion challenges all claims made by the Plaintiffs against them; accordingly, the Court will analyze the motion by addressing each claim in turn.

## I.   Count I - FLSA Violations

For this count, Defendants contend LP&A is not a proper plaintiff; the FLSA claims are barred by the applicable statute of limitations; and, Plaintiffs fail to state FLSA claims against Crouch, Jenson, and Owens.

### A.   Is the Entity Plaintiff a Proper FLSA Plaintiff?

The Court notes at the outset that neither the Defendants nor the Plaintiffs cite to any case law determining whether an entity may constitute an "employee" under the applicable FLSA provisions. After its own investigation, the Court found no case on point and only one unpublished opinion "assum[ing], for the sake of argument, that a corporate entity [could] be properly classified as an employee [under the FLSA], at least to the extent the entity is an alter ego of an individual" for that court's adjudication of a motion to decertify an FLSA collective action. *See Saravia v. Dynamex, Inc.*, No. C 14-05003 WHA, 2016 WL 5946850, at *2 (N.D. Cal. Sept. 30, 2016). Having engaged in no analysis nor consideration of the issue, though, the court's opinion in *Saravia* is not persuasive here.

Accordingly, to determine whether an entity is a proper FLSA plaintiff, "[w]e [must] begin with the plain language of the FLSA." *Johns v. Stewart*, 57 F.3d 1544, 1557 (10th Cir. 1995). The FLSA provides that, "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal

amount as liquidated damages." 29 U.S.C. § 216(b). Under the FLSA, an "employee" is "any individual employed by an employer." *Johns*, 57 F.3d at 1557 (citing 29 U.S.C. § 203(e)(1)). "Employ" is defined as to "suffer or permit to work." *Id.* (citing § 203(g)). Thus, an employee is an "individual" who an employer suffers or permits to work. *Id.*; *see also Matrai v. DirecTV, LLC*, 168 F. Supp. 3d 1347, 1352 (D. Kan. 2016) (citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g))). Courts have interpreted the definition of employee broadly to effectuate the "broad remedial purposes" of the FLSA. *Johns*, 57 F.3d at 1557 (citing *Dole v. Snell*, 875 F.2d 802, 804 (10th Cir. 1989)). "The Supreme Court has noted, however, that although the FLSA's definition of 'employee' is quite broad, 'it does have its limits.'" *Id.* (quoting *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 295 (1985)).

An "employer" subject to the FLSA, on the other hand, is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). A "person" under the FLSA is defined as "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a). Thus, while an FLSA "employee" is limited in its definition to "an individual," an FLSA "employer" is recognized as either an individual or an entity. Considering this distinction, the Court must conclude that Congress intended that only individuals, and not entities, be permitted to bring claims for violations of the FLSA minimum wage (29 U.S.C. § 206) and overtime (29 U.S.C. § 207) provisions. *See Robbins v. Chronister*, 402 F.3d 1047, 1050 (10th Cir. 2005) ("the function of the courts ... [i]s to construe ... [statutory] language so as to give effect to the intent of Congress.") (quoting *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940)); *Fish v. Kobac*, 840 F.3d 710, 740 (10th Cir. 2016) ("When Congress knows how to achieve a specific statutory effect, its

failure to do so evinces an intent not to do so.").   In fact, the Court agrees with Defendants who contend that an entity reasonably cannot be "suffered" or "permitted to work" as required under the FLSA.  *See* 29 U.S.C. § 203(g).

Accordingly, the Court will grant Defendants' motion to dismiss Plaintiff LP&A's FLSA claims against them.

B.      Are Phillips' FLSA Claims Time-Barred?

"The FLSA generally imposes a two-year statute of limitations unless the defendant's violations are shown to be willful, in which case a three-year period applies."  *Mumby v. Pure Energy Servs. (USA), Inc.*, 636 F.3d 1266, 1270 (10th Cir. 2011) (citing 29 U.S.C. § 255(a)).  To fall under the three-year limitation, the plaintiff must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct violated the statute."   *Id.* (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

Defendants argue that, whether a two- or three-year limitation applies, Phillips' FLSA claim is time-barred.  They contend that Phillips' employment with CDC began as an "independent contractor" in 1996 and, even as late as 2007, Phillips first executed a written agreement with CDC which repeatedly referred to Phillips as an "independent contractor."   Thus, Phillips' mis-classification claim accrued upon a "single act" that "should trigger [Phillips'] awareness of and duty to assert his rights," which, arguably, was shortly after he was employed and certainly no later than 2007.  In addition, Defendants assert, "there is no continuing violation [here] because Phillips' FLSA claim arises out of the singular act of CDC allegedly misclassifying him as an independent contractor."  Mot. 5.

Phillips counters that he is not asserting a continuing violation theory, which would allow

recovery on the basis of an ongoing illegal practice initiated prior to the limitations period, but rather, an "each paycheck" theory which is supported by the law and, thus, his claims against Defendants are not time-barred. Phillips asserts that "the law is quite clear that when an employee is improperly classified as 'exempt' a new cause of action accrues each time they [sic] are issued a paycheck that does not pay the appropriate amount." Resp. 2. Phillips argues that Defendants' case law is distinguishable because it involved the execution of "waivers" of any right to receive overtime under the FLSA and whether such execution constituted a single, discrete act from which the FLSA claims accrued. Here, Phillips contends, rather than "one ongoing violation," he has suffered "a series of repeated violations of an identical nature." *Id.* at 5.

Defendants reply that the FLSA waivers addressed in their supporting Fifth Circuit case are much like the agreements Phillips executed in this case and, thus, unlike cases in which employees have no knowledge of any singular act of "misclassification," the continuing violation or "each paycheck" theory does not apply here.

The parties have cited to, and the Court has found, no Tenth Circuit opinions addressing *when* a claim for overtime pay under the FLSA accrues.[2] Certain opinions by district courts within the Circuit have found such claim accrues "at the end of each regular workday" (*Bayles v. Am. Med. Resp. of Colo., Inc.*, 937 F. Supp. 1477, 1489 (D. Colo. 1996)); "at each regular payday immediately

---

[2] The Court notes the Tenth Circuit has held that 29 U.S.C. § 255 "was intended as a limitation on the remedy available, *not on the right to bring the action*, and must be pleaded as an affirmative defense." *Hodgson v. Humphries*, 454 F.2d 1279, 1283–84 (10th Cir.1972) (emphasis added); *see also Donovan v. M&M Wrecker Serv., Inc.*, 733 F.2d 83, 85 (10th Cir. 1984). However, the Supreme Court in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129 (1988) determined that "the statute of limitations applicable to civil actions to enforce the Fair Labor Standards Act (FLSA) ... provides that such actions *must be commenced* within two years 'except that a cause of action arising out of a willful violation *may be commenced* within three years after the cause of action accrued.'" *Id.* (quoting 29 U.S.C. § 255(a)) (emphasis added).

following the work period during which the services were rendered for which the wage or overtime compensation is claimed" (*Arnold v. Schlumberger Tech. Corp.*, No. 10cv346 MCA, 2010 WL 9007208, at *7 (D.N.M. Oct. 29, 2010) (collecting cases) and *Allison v. Frito-Lay, Inc.*, No. 91-4193-C, 1992 WL 123799, at *3 (D. Kan. Mar. 27, 1992) (same)); and "each time the employer issues a paycheck in violation of the FLSA" (*Topp v. Lone Tree Athletic Club, Inc.*, No. 13-cv-01645-WYD-KLM, 2014 WL 3509201, at *8 (D. Colo. July 14, 2014)).  Notably, in none of these cases did the plaintiff employee(s) execute an employment agreement with the employer.

Phillips relies primarily on four cases to support his argument that an FLSA overtime claim accrues each time an employee is issued a paycheck containing insufficient or no overtime pay for work performed.  One of these cases—*Knight v. Columbus*, 19 F.3d 579 (11th Cir. 1994)—addresses the applicability of the FLSA statute of limitations under two theories and, in so doing, analyzes Defendants' primary case, *Alldread v. City of Grenada*, 988 F.2d 1425 (5th Cir. 1993), in such a way as to lead this Court to conclude Phillips' claims are not time-barred.

In *Alldread*, the plaintiff firefighters alleged that the defendant city coerced them into signing waivers of overtime pay in the implementation of a new pay system that occurred four years before they filed the lawsuit seeking recovery for overtime pay.  *Id.* at 1429.  The Fifth Circuit characterized the issue as "whether the reduction in pay was a single act of discrimination under the FLSA, hence barred by its three year statute of limitations, or whether the reduction effected in each subsequent paycheck constitutes a violation of the Act, thus making the complaint timely, at least in part."  *Id.* at 1430 (quoting *Hendrix v. Yazoo City*, 911 F.2d 1102 (5th Cir. 1990)).  In determining the alleged coercion and implementation of the new pay system was the former (*i.e.*, claim was time-barred), the court cited the Supreme Court's opinion in *Lorance v. AT & T Techs., Inc.*, 490 U.S.

12

900, 912 n.5 (1989), which explained:

> With a facially neutral system the discriminatory act occurs only at the time of adoption, for each application is nondiscriminatory.... But a facially discriminatory system ... by definition discriminates each time it is applied.

*Alldread*, 988 F.2d at 1431. Thus, the court concluded, "the district court properly construed the FLSA agreements or waivers as an integral part of the City's pay policy and concluded that the policy was facially valid." *Id.* at 1431-32.

Defendants rely on *Alldread* to argue that Phillips' allegations also involve statements of "coercion" and that the independent contractor agreements Phillips executed are similar to the FLSA waiver agreements. This Court is not persuaded. In *Knight v. Columbus*, the Eleventh Circuit was asked to determine whether the FLSA statute of limitations barred the plaintiff firefighters' overtime claims under a "misclassification" theory and under a "retaliation" theory. 19 F.3d at 580. The *Knight* court found the *Alldread* opinion was distinguishable from the misclassification claims of the *Knight* plaintiffs because,

> the claims of the officer plaintiffs in the present case are not [based on a single FLSA violation]; they do not require reference to any action taken by the City outside the limitations period. It is true that the City's original adoption of the pay policy occurred more than three years ago, but the officer plaintiffs need not prove the adoption of that pay policy to recover. If they are truly not exempt employees, the officer plaintiffs only need to prove that they have worked unpaid overtime hours during the statute of limitations period.

*Knight*, 19 F.3d at 583. Similarly, the opinion in *Anderson v. City of Bristol*, 6 F.3d 1168 (6th Cir. 1993) was distinguishable where

> the *Anderson* plaintiffs' sole complaint was that the city had recalculated their wage rates so as to eliminate the future impact of overtime pay. *Id.* at 1169. The wage recalculation had occurred five years before the plaintiffs filed suit, *id.*, and "[t]he only continuing effect [was] a reduced pay rate that absorbed any overtime increase that would have occurred without the wage reduction." *Id.* at 1176. Each actual paycheck included payment for overtime worked, but because the plaintiffs' base pay

had been reduced, their take-home pay remained unchanged. The court reasoned that any unlawful action by the city occurred outside the statute of limitations.

*Knight*, 19 F.3d at 582.  Finally, in *Knight* itself, the court found that the retaliation claims were time-barred because "[f]or the non-officer plaintiffs to prevail, they must establish that the City violated the FLSA when it failed to give them a pay raise in July 1987, which was more than three years before the commencement of this action in October 1990."  *Id.* at 584.

From *Knight, Anderson, and Alldread*, the Court discerns that if the challenged action by the defendant employer is facially valid and must be proved (i.e., FLSA waivers, wage recalculation, pay raise denial) for a plaintiff to recover, such action constitutes a single, discrete act from which an FLSA claim accrues; however, if the action is facially discriminatory (*i.e.*, misclassification as an exempt employee or an independent contractor[3]), but need not be proved for a plaintiff to recover under the FLSA, the "continuing violation" or "each paycheck" theory applies.  In this case, as was true for the officer plaintiffs in *Knight*, Phillips need not prove that Defendants misclassified him as an independent contractor to recover overtime pay under the FLSA, but only that he is properly classified as a nonexempt employee of CDC.  *See Knight*, 19 F.3d at 583; *see also Gustafson v. Bell Atl. Corp.*, 171 F. Supp. 2d 311, 322 (S.D.N.Y. 2001) (applying the "each paycheck" theory to a statute of limitations defense to claim for misclassification as an independent contractor) (citing *Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118 (2d Cir. 1997)).

Accordingly, Phillips, to the extent he succeeds in proving his FLSA claim, may recover for

---

[3]Although the Court recognizes a distinction between an employee classified as "exempt" at the employer's discretion and an individual classified as an independent contractor with his or her consent, the Court finds such distinction minimal for purposes of this analysis where, under both scenarios, the individual typically accepts employment with (apparently) full knowledge of the employer's classification.

any overtime worked but not paid on or after September 29, 2014 or, if Phillips proves Defendants'

conduct was willful, for overtime worked but not paid on or after September 29, 2013. Defendants'

motion to dismiss in this regard is denied.

C.    Has Phillips Properly Sued the Individual Defendants Under the FLSA?

Defendants argue that Phillips' allegations concerning the individual Defendants are

conclusory and, thus, insufficient to state a claim for liability under the FLSA.

The Honorable Christine M. Arguello recently issued a decision analyzing whether a

plaintiff's allegations were sufficient to state an FLSA claim of individual liability. *Lopez v. Next*

*Generation Constr. & Envtl., LLC*, No. 16-cv-00076-CMA, 2016 WL 6600243 (D. Colo. Nov. 8,

2016). This Court gratefully adopts Judge Arguello's statement of the law in this area:

> In FLSA cases, personal liability has often been imposed on individual officers in a
> corporation without conducting a traditional veil-piercing analysis. *See, e.g.,*
> *Saavedra v. Lowe's Home Ctrs., Inc.*, 748 F. Supp. 2d 1273, 1284 (D.N.M. 2010);
> *Digiore v. State of Ill.*, 962 F. Supp. 1064, 1080 (N.D. Ill. 1997); *Donovan v. Agnew*,
> 712 F.2d 1509, 1511–12 (1st Cir. 1983); *Donovan v. Sabine Irrigation Co., Inc.*, 695
> F.2d 190, 194–95 (5th Cir.), *cert. denied*, 463 U.S. 1207 (1983); *Marchak v.*
> *Observer Publ'ns, Inc.*, 493 F. Supp. 278, 282 (D.R.I. 1980); *Brennan v. Whatley*,
> 432 F. Supp. 465, 469 (E.D. Tex. 1977); *Hodgson v. Royal Crown Bottling Co.*, 324
> F. Supp. 342, 347 (D. Miss. 1970), *aff'd*, 465 F.2d 473 (5th Cir. 1972); *Schultz v.*
> *Chalk–Fitzgerald Constr. Co.*, 309 F. Supp. 1255 (D. Mass. 1970).
>
> Such liability has instead been imposed on the ground that the particular individual
> falls within the FLSA's definition of "employer" and thus shares statutory
> obligations with the corporation itself. *See, e.g. Saavedra*, 748 F. Supp. 2d at 1284
> ("A person must be an 'employer' within the meaning of the . . . FLSA to be held
> individually liable under [the] statute."); *Digiore*, 962 F. Supp. at 1080 (the FLSA
> contemplates individual liability under term "employer"); *Donovan*, 712 F.2d at
> 1511 (imposing liability for FLSA violations upon an individual shareholder as an
> "employer" within the meaning of FLSA Section 3(d), 29 U.S.C. § 203(d)).
>
> This occurs because an "employer" under the FLSA is defined to "include[ ] any
> person acting directly or indirectly in the interest of an employer in relation to an
> employee." 29 U.S.C. § 203(d). "Person" includes "an individual," and "employ"
> includes to "suffer or permit to work." *Id.* Courts construe these provisions

15

expansively, *Robertson v. Bd. of Cty. Comm'rs of Cty. of Morgan*, 78 F. Supp. 2d 1142, 1150 (D. Colo. 1999), and an employee may have several simultaneous employers, *id.*; *Falk v. Brennan*, 414 U.S. 190, 195 (1973).

The Tenth Circuit has considered numerous factors when determining whether an individual is an "employer" under the FLSA, including whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records. *Hodgson v. Okada*, 472 F.2d 965, 968–69 (10th Cir. 1973); *Mitchell v. Hertzke*, 234 F.2d 183, 189–90 (10th Cir. 1956); *see also Robertson*, 78 F. Supp. 2d at 1150–51; *Herman v. RSR Sec. Servs., Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) ("[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question, ... with an eye to the 'economic reality' presented by the facts of each case."); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1439 (10th Cir. 1998) (applying these factors to assess the employer-employee relationship). Courts have also looked at the level of operational control the individual has over the company, including whether the individual is "involved in the day-to-day operation or ha[s] some direct responsibility for the supervision of the employee." *Koellhoffer v. Plotke–Giordani*, 858 F. Supp. 2d 1181, 1189–90 (D. Colo. 2012) (quoting *Alvarez Perez v. Sanford–Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1160 (11th Cir. 2008)).

*Lopez*, 2016 WL 6600243 at *3-*4.

In this case, Phillips' only argument in response to Defendants' contention that his allegations are conclusory and insufficient is that he has "not yet had the opportunity to engage in any discovery." Resp. 9. The Court is not convinced; a challenge pursuant to Fed. R. Civ. P. 12(b)(6) is made directly in response to an operative pleading and, thus, typically occurs before the start of discovery. Certainly, the Supreme Court had this in mind when interpreting Rules 8 and 12(b). *See Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 679.

Here, Phillips brings his FLSA claims against CDC, as well as the individual Defendants Crouch, Jenson, and Owens. With respect to Gayle Crouch, Phillips alleges she "is one of the owners and Directors of the Board for Defendant [CDC]. ... She has directed or, at [the] very least, approved and ratified many of Defendant CDC's activities and policies, FLSA violations, and

16

fraudulent and unlawful activities that have given rise to the claims enumerated in the instant case." Compl. ¶ 6. Phillips describes Greg Jenson with the same language. *Id.* ¶ 7. Phillips uses the same language to describe Charles Owens except, rather than an "owner and director," Mr. Owens is characterized as a "managerial level employee of Defendant CDC." *Id.* ¶ 8. Later, in the "factual background" section of the pleading, Phillips refers to Owens as "CDC's Director of Sales and Marketing." *Id.* ¶ 54. However, the factual allegations reference none of the individual Defendants concerning overtime pay. Under Count I, Phillips refers repeatedly to CDC but, with respect to Crouch, Jenson, and Owens, he states only "[t]he individual defendants, and each of them, are employers as that term is described in the [FLSA] and, therefore, are individually liable for the losses suffered by the Plaintiff." *Id.* ¶ 83.

The Court concludes Phillips' allegations are conclusory and insufficient to state a claim for individual liability under the FLSA. Essentially, the allegations reveal only the individual Defendants' titles at CDC and from such titles, Phillips asks the Defendants and the Court to assume they constitute "employers" under the FLSA. The Court declines to do so and finds that Phillips has failed to state plausible FLSA claims against Defendants Crouch, Jenson, and Owens. Defendants' motion to dismiss will be granted in this regard.

**II.      Count II - Unjust Enrichment**

Defendants argue that Plaintiffs' unjust enrichment claim is (1) barred by the existence of a written contract; (2) time-barred; and (3) vague and insufficient to survive the *Iqbal/Twombly* requirements for plausible allegations against the individual Defendants.

A.      Barred by Written Contract

Defendants contend the broker/independent contractor agreements govern the same subject matter as that alleged to support Plaintiffs' unjust enrichment claims and, as such, Plaintiffs' claim cannot stand.  Defendants assert that because Plaintiffs have not rescinded the agreements and, in fact, rely on such agreements for the breach of contract and tortious interference claims, the written agreements preclude any claim for unjust enrichment.  Plaintiffs counter that "[t]here is a significant factual dispute as to the validity of the Plaintiffs' contracts, given the circumstances in which they were entered."  Resp. 11.

To state a claim for unjust enrichment, Plaintiffs must allege that: (1) at plaintiff's expense, (2) defendant received a benefit, (3) under circumstances that would make it unjust for defendant to retain the benefit without paying. *See Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008) (en banc).

> Unjust enrichment is a form of quasi-contract or a contract implied in law. As such, it is an equitable remedy and does not depend on any contract, oral or written. The theory does not require any promise or privity between the parties. Rather, it is a judicially created remedy designed to avoid benefit to one to the unfair detriment of another.

*Hottinger Excavating & Ready Mix, LLC v. R.E. Crawford Constr., LLC*, 175 F. Supp. 3d 1269, 1278 (D. Colo. 2016) (quoting *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000) (en banc) (internal citations omitted)).

"[I]n general, a party cannot recover for unjust enrichment by asserting a quasi-contract when an express contract covers the same subject matter because the express contract precludes any implied-in-law contract."  *Interbank Invs., LLC. v. Eagle River Water & Sanitation Dist.*, 77 P.3d 814, 816 (Colo. App. 2003).  However, a plaintiff that is party to an express contract may nonetheless bring an unjust enrichment claim when it "will have no right under an enforceable

contract." *Id.*; *see also Dudding v. Norton Frickey & Assocs.*, 11 P.3d 441, 447–48 (Colo. 2000) (en banc). Thus, while a plaintiff may not recover damages under an unjust enrichment claim that are identical to those available under its other claims, "it is well-established that a plaintiff may seek alternative theories of recovery, even when only one of those theories could actually bear fruit at trial." *Bd. of Cty. Comm'rs of La Plata Cty. v. Brown Grp. Retail, Inc.*, 598 F. Supp 2d 1185, 1192 (D. Colo. 2009) (citations omitted).

Thus, Defendants are correct (and Plaintiffs do not dispute) that Plaintiffs may not recover under Count II if the broker/independent contractor agreements are deemed enforceable. However, the Court finds that, if Phillips[4] is found to be an employee of CDC under the FLSA, rather than an independent contractor, the enforceability of the agreements may be in question. Thus, since it is possible that a determination during the litigation might render the agreements invalid, the Court will construe the unjust enrichment claim as an "alternative" to the Plaintiffs' breach of contract and tortious interference claims. *Bd. of Cty. Comm'rs of La Plata Cty.*, 598 F. Supp 2d at 1192. The motion to dismiss will be denied in this regard.

B.     Statute of Limitations

Defendants assert that Plaintiffs knew or should have known of their injury(ies) under this claim well before the three-year statute of limitations. Plaintiffs counter that "the unjust enrichment injury was still happening at the time they filed the complaint." Resp. 10.

"[B]ecause unjust enrichment is a form of relief in quasi-contract or contract implied in law, the time within which to assert such a claim ordinarily is assessed under the three-year statute of limitations for contract actions." *Sterenbuch v. Goss*, 266 P.3d 428, 437 (Colo. App. 2011) (citing

---

[4]It is undisputed that Phillips was a party to the agreements, not LP&A.

Colo. Rev. Stat. § 13–80–101(1)(a) and *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000)).

A claim of unjust enrichment accrues "when a person discovers, or through the exercise of

reasonable diligence should discover, that all elements of the claim are present." *Id.* (quoting

*Hannon Law Firm, LLC v. Melat, Pressman & Higbie, LLP*, 293 P.3d 55, 58 (Colo. App. 2011)).

Here, the Plaintiffs' allegations taken as true reveal that Phillips believed, from the time he

began a working relationship with Defendants in 1996, that the company he formed under the "CDC

business model" would eventually become his own business. Compl. ¶¶ 24, 25. It was not until

2015 that Phillips learned CDC placed another "broker" in what he considered his sales territory.

Compl. ¶¶ 55, 56, 61, 63. The Court finds a reasonable jury could conclude from these facts that

Phillips first learned in 2015 that CDC interpreted the business relationship differently than he did

in that CDC had the control over and ability to diminish Plaintiffs' sales generation and income. As

such, Plaintiffs' allegations plausibly state that Phillips first learned in 2015 of circumstances under

which it may be unjust for CDC to retain the benefits of Phillips' investments into LP&A, which

Phillips believed would be his own. *See* Compl. ¶ 89 ("A financial benefit was conferred on

Defendant CDC by Plaintiff by reason of his capital investments into the Carpet Direct organization

through acquisition of equipment on the organization's behalf, payment of rent for space for the

organization, and acceptance of less remuneration because of his false belief that he was building

equity in a company.").

Because Plaintiffs' allegations, taken as true, demonstrate that Phillips' knowledge of the

facts essential to the cause of action occurred in 2015, the Court will deny the motion to dismiss.

C.     Individual Defendants

20

Defendants contend the "Complaint is unclear whether Phillips is asserting unjust enrichment against CDC only or also against the individual Defendants" and argue "Phillips does not assert any facts supporting the conclusion that the individual Defendants were unjustly enriched." Mot. 8. Plaintiffs do not address this argument. The Court disagrees with the former, but agrees with the latter and finds that the Complaint specifically alleges Count II "as to Defendant CDC" and fails to assert facts necessary to allege a plausible unjust enrichment claim against the individual Defendants. Accordingly, Count II is alleged solely against Defendant CDC, and the motion to dismiss will be denied as moot in this regard.

## III.    Count III - Breach of Contract[5]

Defendants argue Plaintiffs' breach of contract claim fails because the subject agreement does not contain the "exclusivity" clause on which Plaintiffs rely for the claim. Plaintiffs counter that, when a contract is silent as to a material term, the parties' "course of dealing" may guide the court in supplying an omitted term. Defendants reply that the parties' course of dealing may not override a document's plain meaning.

The Tenth Circuit has recently interpreted and set forth a statement of Colorado law concerning the interpretation of contracts:

> Under Colorado law, contracts "should be interpreted consistently with the well-established principles of contractual interpretation." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). Courts "must examine [contractual] terms and attempt to determine the intent of the parties." *East Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 973 (Colo. 2005). What courts are after is the parties' mutual intent. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984). Absent an indication the parties chose to deviate from plain meaning, "the instrument's language must be examined and construed in harmony

---

[5]The argument analyzed in this section also involves Plaintiffs' tortious interference claim and will be resolved as to both.

with the plain and generally accepted meaning of the words used." *East Ridge*, 109 P.3d at 974. In other words, common usage prevails, and "strained constructions should be avoided." *Allstate*, 52 P.3d at 819.

\* \* \*

When a contractual provision unambiguously resolves the parties' dispute, the interpreting court's task is over. "It is axiomatic that in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Pepcol*, 687 P.2d at 1314. When, on the other hand, "an ambiguity has been determined to exist, the meaning of its terms is generally an issue of fact to be determined in the same manner as other factual issues." *East Ridge*, 109 P.3d at 974. Extrinsic evidence, for example, becomes admissible to determine the meaning of a contractual provision at issue. "This extrinsic evidence may include any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." *Pepcol*, 687 P.2d at 1314. Courts in Colorado "have found the conduct of the parties before the controversy arose to be a reliable test of their interpretation of the agreement." *East Ridge*, 109 P.3d at 975.

Determining whether "a written contract is ambiguous is a question of law." *Id.* It is not enough that the parties disagree about the meaning. *Id.* "Rather, a contract is ambiguous [only] if it is fairly susceptible to more than one interpretation." *Id.* (quotation omitted). In guiding this determination, however, Colorado law no longer restricts the interpreting court to the four corners of the contract. *Id.* Where appropriate, "extrinsic evidence may be conditionally admitted to determine whether the contract is ambiguous." *Id.* This evidence, though, must be stricken if the court, after considering the evidence, has determined no ambiguity exists. *Pepcol*, 687 P.2d at 1314 n. 3.

*Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154-55 (10th Cir. 2008); *see also*

*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1211 (10th Cir. 2007) ("if the

relevant contract provision is unambiguous, the course of dealing may not override the document's

plain meaning.").

Here, a copy of the CDC Broker/Independent Contractor Agreement in force at the time of

the alleged breach is found at ECF Nos. 2-3, 3-1, and 4-1 ("Agreement"). The copy provided to the

Court is not signed, but there is no dispute between the parties that the February 18, 2014 Agreement

was in force. It is also undisputed that the Agreement refers to the Broker's "Sales Territory"

(defined as "the counties of Larimer, Boulder, and Weld" and "[t]he municipalities of Fort Collins, Loveland, Windsor, Greeley, Wellington, and Cheyenne, WY") in several provisions, but no provision of the Agreement expressly states that the Broker has "exclusive rights" to sell in the Sales Territory.  However, the Court agrees with Plaintiffs that the Agreement is ambiguous, or "fairly susceptible to more than one interpretation," in that certain provisions the Agreement may be reasonably interpreted as conferring "exclusive rights" on Phillips concerning the Sales Territory.

For example, in the Recitals, the parties stipulate that CDC "wishes to engage" Phillips, and Phillips "is willing," "to sell and manage the distribution of flooring on Carpet Direct's behalf in the Sales Territory."  This provision is also found in ¶ 2.1 of the Agreement.  In addition, the following provisions suggest the "exclusivity" of Phillips' right to sell in the Sales Territory:

- Broker agrees to provide guidance and coordinate the marketing and sales of the Sales Reps in order to maximize the sales of Flooring by Carpet Direct in the Sales Territory (¶ 2.2);

- Broker agrees to manage Carpet Direct's offices and warehouse facilities in the Sales Territory, including the ordering, receipt and distribution of *all* Flooring (¶ 2.3 (emphasis added));

- Broker further agrees to ensure that all Sales Reps *within his/her Sales Territory* use only the banks specified by Carpet Direct for the deposit of the amounts that any Sales Rep in the Sales Territory receives from the sale of Flooring (¶ 2.5 (emphasis added));

- Carpet Direct agrees to pay Broker a commission equal to fifteen percent (15%) of the gross amount of sales of Flooring . . . procured for Carpet Direct in the Sales Territory *through Broker's individual efforts* (¶ 4 (emphasis added));

- Carpet Direct also  agrees to pay Broker a commission equal to five percent (5%) of the gross amount of sales of Flooring . . . procured for Carpet Direct in the Sales Territory by any sales agent under the Broker's supervision (*id.*);

- . . . the Broker is responsible and shall pay for all warehouse costs in excess of 1.0% of the Sales Volume of the Brokerage. "Sales Volume of the

23

> Brokerage" is defined as all sales (within the calendar month for which the expenses occurred) of the Broker and his/her Sales Reps within the Sales Territory less sales taxes (¶ 8.2).

Moreover, the Agreement's "Covenant Not to Compete" requires that Phillips refrain from engaging in any "direct sales" of flooring in the Sales Territory for a period of 18 months after termination of the Agreement (¶ 15.2). The Court concludes that a reading of these provisions and the Agreement as a whole reveals an ambiguity as to whether Phillips had the exclusive right to sell CDC Flooring in the Sales Territory. As such, the issue becomes one for a fact finder to decide. *See Level 3 Commc'ns*, 535 F.3d at 1155. Therefore, the Court will deny the motion to dismiss Plaintiffs' breach of contract and tortious interference claims on this argument.

## IV.    Count IV - Tortious Interference with Business Contract

Defendants contend that Plaintiffs have failed to allege facts sufficient to establish the necessary motivation of Defendant Owens to interfere, and Plaintiffs' allegations against Defendant Kinsey amount to legal business competition.

### A.    Owens

First, the Court disagrees that the allegations fail to establish Owens' "necessary" motivation to "harm" the Plaintiffs. Plaintiffs assert that Kinsey, Owens' long-time family friend, complained to Owens (CDC Director of Sales and Marketing) that he was not making enough money as Plaintiffs' Sales Rep. Compl. ¶¶ 54-55. In response, Owens established a brokerage for Kinsey in Loveland, Colorado – Plaintiffs' defined Sales Territory – and Kinsey's warehouse was located only minutes away from Plaintiffs'. *Id.* The Court finds that these allegations state a plausible claim that Owens was motivated by a personal desire to interfere in Plaintiffs' contract with CDC. The Court will deny the motion to dismiss Plaintiffs' tortious interference claim against Owens.

B.   <u>Kinsey</u>

However, the Court agrees that Plaintiffs' tortious inference claim cannot stand against Kinsey. "[T]o prove tortious interference with contract, a plaintiff must show: (1) a contract existed; (2) the defendant had knowledge of the contract; (3) the defendant interfered and induced the other party to breach the contract; and (4) the plaintiff was injured as a result. *Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1115 (D. Colo. 2004) (citing *Westfield Dev. Co. v. Rifle Inv. Ass'n.*, 786 P.2d 1112, 1117 (Colo. 1990) (en banc)). Most importantly, the interference must be intentional and improper. *Id.* (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 501 (Colo. 1996) (en banc)).

As Defendants argue, "[i]nterference with a contract is not improper when it involves a matter of competition between the parties." *Id.*   In this case, the allegations, taken as true, demonstrate Kinsey was a Sales Rep for the Plaintiffs, for whom Owens assigned a brokerage in the contracted Sales Territory.   Under Colorado law, "a defendant who intentionally causes a third person to breach a contract with the plaintiff does not engage in improper conduct if: (1) it concerns a matter of competition between the defendant and plaintiff; (2) the defendant does not employ wrongful means; (3) the action does not amount to an unlawful restraint of trade; and (4) the defendant's purpose is, at least in part, to advance its own interest. *Id.* (citing *Ervin*, 908 P.2d at 501). "'Wrongful means' include physical violence, fraud, civil suits, and criminal prosecutions. Id. at 1115-16 (citing *Ervin*, 908 P.2d at 502).

Thus, Plaintiffs must show that Kinsey plausibly interfered with the contract and that he engaged in improper conduct.  Here, the allegations do not plausibly state how Kinsey, a "Sales Rep," had the ability to interfere with the Agreement between Phillips and CDC.  In addition,

Kinsey's conduct indisputably concerns a matter of competition between Plaintiffs and Kinsey, he is not alleged to have engaged in physical violence, fraud, civil suits, or criminal prosecutions, the brokerage, as alleged, does not amount to an unlawful restraint of trade, and the allegations demonstrate Kinsey's purpose is to advance his own interest (*i.e.*, make more money).

Accordingly, the Court must conclude that Plaintiffs fail to state a plausible claim for tortious interference against Defendant Kinsey, and the motion to dismiss will be granted as to this claim.

## CONCLUSION

In sum, the Court concludes that Plaintiffs' factual allegations are plausible to state an FLSA claim on behalf of Phillips against CDC, but all other FLSA claims are dismissed. In addition, Plaintiffs state plausible claims of unjust enrichment and breach of contract against Defendant CDC. Finally, Plaintiffs state a plausible claim for tortious interference against Owens, but not against Kinsey.

Accordingly, this Court **grants in part and denies in part** Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) [filed November 11, 2016; ECF No. 19] as follows:

1. Plaintiffs' FLSA claim (Count I) is dismissed as to the individual Defendants;

2. The FLSA claim brought by Plaintiff LP&A is dismissed, but the claim brought by Phillips will proceed against Defendant CDC;

3. Plaintiffs' unjust enrichment (Count II) and breach of contract (Count III) claims against Defendant CDC will proceed as alternative theories of relief; and

4. Plaintiffs' tortious interference claim (Count IV) is dismissed against Defendant Kinsey, but will proceed against Defendant Owens.

In light of this order, the Clerk of the Court is directed to dismiss Defendants Crouch, Jenson, and

Kinsey from this action.

Dated at Denver, Colorado, this 10th day of January, 2017.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge